# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SANDI J. MCCOY,<br><br>Defendant. | Case No. 1:18-po-00088-SAB<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(ECF Nos. 10, 11, 12) |

Currently before the Court is Sandi J. McCoy's ("Defendant") motion to suppress evidence. Defendant's motion to suppress was heard on February 7, 2019. Counsel Gary M. Leuis was present for the United States, and counsel Hope Alley was present for Defendant. This matter was submitted following oral argument at the hearing and was taken under advisement. Having considered the moving, opposition and reply papers, the exhibits attached thereto, and evidence and arguments presented at the February 7, 2019 hearing, the Court issues the following order.

**I.**

**BACKGROUND**

**A.     Procedural Background**

On April 9, 2018, in Sequoia National Park, Defendant was issued citations for possession of cocaine, in violation of 36 C.F.R. § 2.35(b)(2), and for carrying an open bottle of

1

1   alcohol, in violation of 36 C.F.R. § 4.14(b).  The citation was filed on June 7, 2018.  (ECF No.
2   1.)  Defendant made an initial appearance on June 21, 2018.  A status conference was held on
3   November 1, 2018, at which a briefing schedule was set for Defendant to file a motion to
4   suppress.  (ECF No. 9.)

5         Defendant filed a motion to suppress on December 20, 2018.  (Def.'s Mot. Suppress
6   ("MTS"), ECF No. 10.)[1]  The United States filed an opposition to the motion to suppress on
7   January 17, 2019.  (Opp'n Mot. Suppress ("Opp'n"), ECF No. 11.)  On January 31, 2019,
8   Defendant filed a reply.  (Def.'s Reply Opp'n ("Def. Reply"), ECF No. 12.)

9         **B.**    **Factual and Legal Contentions Submitted in the Briefing**

10        The parties have differing contentions as to the facts that occurred the day the citations
11  were issued.

12        1.    <u>The Probable Cause Statement and Incident Report</u>

13        According to the probable cause statement and incident report, Ranger Elizabeth Dietzen
14  ("Ranger Dietzen") alleges that while on patrol in Sequoia National Park on April 9, 2018, she
15  observed a blue Ford Focus parked at Tunnel Rock with a male outside, later identified as Keith
16  Beebe, placing what appeared to be beer in a cooler.  (Incident Report ("Incid. R.") Ex. A, at 5-6,
17  ECF No. 11; Statement Probable Cause ("State. Prob. C.") Ex. 1, at 2, ECF No. 10-1.)
18  Approximately ten minutes later, while continuing northbound on the Generals Highway, she
19  observed the same blue Ford Focus also traveling northbound.  (<u>Id.</u>)  Shortly after, Ranger
20  Dietzen turned her marked patrol vehicle around to follow the vehicle, and the blue Ford Focus
21  "pulled off of the roadway and into a dirt pull-out without signaling."[2]  (<u>Id.</u>)  She pulled into the
22  dirt pull-out behind the vehicle and then activated her lights to signal she was stopping the
23  vehicle.  (Incid. R. at 5.)

24        After making contact with the vehicle, Ranger Dietzen "noted a faint odor of marijuana
25  emanating from it."  (Incid. R. at 5; State. Prob. C. at 2.)  Ranger Dietzen also saw a can of

---

26  [1] References to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.
27

28  [2] The Court notes that Ranger Dietzen states that both her vehicle and the blue Ford Focus were driving northbound, however also states she "turned to follow the vehicle."

1  Rolling Rock beer sitting in the console on the passenger side.  (Incid. R. at 5.)  Ranger Dietzen
2  asked the driver, Mr. Beebe, how much marijuana was in the vehicle, and he stated "a little bit."
3  (Id.)  When informed marijuana was illegal in the park, Mr. Beebe stated he was unaware, and
4  that he had a prescription for it.  (Id.)  Ranger Dietzen asked who the beer belonged to, and
5  Defendant, Ms. McCoy, stated it was hers.  (Id.)

6        Ranger Dietzen informed Mr. Beebe that she was going to search the vehicle, and asked
7  him if she could check him for weapons, and he consented.  (Id.)  During a weapons check,
8  Ranger Dietzen felt what she immediately recognized to be a glass pipe in Mr. Beebe's right
9  pocket, which had marijuana residue.  (Id.)  Dietzen also performed a weapons check on the
10 Defendant, after she consented.  (Id.)

11       Ranger Dietzen then conducted a probable cause search of the vehicle.  (Incid. R. at 5;
12 State. Prob. C. at 2.)  During a search of the vehicle, Ranger Dietzen found a metal mirror
13 compact within a make-up bag that contained a trace amount of white crystals, and the
14 Defendant, a passenger in the vehicle, claimed ownership of the make-up bag.  (State. Prob. C. at
15 2)  Ranger Dietzen called Supervisory Ranger Chris Waldschmidt to conduct a field narcotics
16 identification test, and the field test of the crystals resulted in a positive reading for
17 methamphetamine.  (Incid. R. at 5; State. Prob. C. at 2.)  Defendant stated she wasn't sure what
18 the white crystal substance was.  (Incid. R. at 5.)

19       In addition, a plastic container with the Defendant's debit card, small razors, and a small
20 rubber container with an amount of white powder was found by Ranger Chris Waldschmidt.
21 (State. Prob. C. at 2.)  When asked about the white powder, Defendant stated "that's mine,"
22 admitted "it's cocaine," and stated she was using it to lose weight.  (State. Prob. C. at 2.)  The
23 white powdery substance was not field tested due to a risk of opening and losing the substance.
24 (Incid. R. at 5.)  The methamphetamine residue, white power, and thirty-three (33) grams of a
25 green leafy substance were seized and placed into evidence.  (Id.)

26     2.    <u>Defendant's Factual Contentions Regarding the Search and Seizure of the Vehicle</u>
27       While the parties do not appear to dispute the events that occurred after Ranger Dietzen
28 approached the stopped vehicle, the events leading up to that point are disputed.  The driver of

1 the vehicle, Keith Beebe, who is not a party to this case, submitted a declaration in support of
2 Defendant's motion to suppress.  (Decl. Keith Beebe ("Beebe Decl.") Ex. 2, at 2-3, ECF No. 10-
3 2.)  Mr. Beebe contends that as he was driving, he noticed a ranger turn on the vehicle's
4 overhead lights, that "[i]t was clear that the ranger was stopping [his] vehicle, so [he] pulled into
5 the closest pull out," and that "[w]hen the ranger put on her lights, [he] was not speeding or
6 committing any other traffic violation."  (Id. at 2.)  Mr. Beebe contends he was on the "road at
7 the time that the ranger turned her lights on," "only pulled into the pullout because the ranger had
8 turned on her overhead lights," and that Ranger Dietzen then approached his window and stated
9 she pulled him over for not using a turn signal when he pulled into the turnout.  (Id. at 2-3.)

          3.          The Parties' Arguments as to the Motion to Suppress

11 Defendant argues that the evidence obtained from the stop must be excluded because
12 based on Mr. Beebe's account of the incident, the ranger initiated the stop before Mr. Beebe
13 pulled over, and thus the failure to indicate with the turn signal cannot be a proper basis of the
14 stop.  (Def. Mot. at 3-4.)  Therefore, the stop was conducted without reasonable suspicion, a
15 violation of the Fourth Amendment.  (Id., citing United States v. Cortez, 449 U.S. 411, 417–18
16 (1981) (An officer making a traffic stop "must have a particularized and objective basis for
17 suspecting the particular person stopped of criminal activity," in light of the totality of the
18 circumstances.)).

19 The Government responds that in assessing the reasonableness of the stop, the question is
20 whether "the facts available to the officer at the moment of the seizure or the search 'warrant a
21 man of reasonable caution in the belief that the action taken was appropriate.' "  (Pl. Opp'n at 3,
22 quoting Terry v. Ohio, 88 S. Ct. 1868, 1880 (1968)).  The Government contends that Ranger
23 Dietzen's incident report cites specific, articulable facts to support her contention that there
24 existed reasonable suspicion that the driver had violated the traffic laws, and thereby to justify
25 the traffic stop.  (Pl. Opp'n at 2-3.)  Defendant maintains that Beebe's unsupported claim that
26 ranger Dietzen pulled his vehicle over prior to him turning without using a turn signal, would not
27 overcome a reasonable person's belief that ranger Dietzen's stop of Beebe's vehicle was
28 appropriate.  (Pl. Opp'n at 3.)

4

The Government requested the motion to suppress be denied and an evidentiary hearing be held to determine the contested issues of fact. While Defendant does not specifically request an evidentiary hearing, in her reply, she states "Defendant's motion to suppress turns on a factual dispute that the Court should determine after evaluating all evidence presented at the evidentiary hearing." (Def. Reply at 1.)

## II.

## LEGAL STANDARD

In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Florida. v. Jimeno, 500 U.S. 248, 250 (1991); Morgan v. United States, 323 F.3d 776, 781 (9th Cir. 2003). The basic rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

The Supreme Court has held that "evidence seized during an unlawful search could not constitute proof against the victim of the search." Wong Sun v. United States, 371 U.S. 471, 484 (1963). This exclusionary rule is the principal remedy to deter violations of the Fourth Amendment and encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality[.]" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016).

"The Supreme Court created the exclusionary rule as a sanction to bar the prosecution from introducing evidence that was obtained by way of a Fourth Amendment violation. U.S. v. Phillips, 9 F.Supp.3d 1130, 1133 (E.D. Cal. 2014). The exclusionary rule is a "prudential" doctrine that is not a personal constitutional right nor is it designed to "redress the injury" from an unconstitutional search. Davis v. U.S., 131 S. Ct. 2419, 2426 (2011). The purpose of the exclusionary rule is to deter future Fourth Amendment violations. Davis 131 S. Ct. at 2427. The

1  exclusionary rule takes a "costly toll upon truth-seeking and law enforcement objectives" and is
2  only applied "where its deterrence benefits outweigh its substantial societal costs." Hudson v.
3  Michigan, 547 U.S. 586, 591 (2006) (internal punctuation and citations omitted).  "When the
4  police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment
5  rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."
6  Davis, 131 S. Ct. at 2427.

7  Law enforcement officers may, consistent with the Fourth Amendment, engage in brief
8  investigatory stops if the officers have reasonable suspicion that an individual is engaged in
9  criminal activity.  United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392
10 U.S. 1, 9 (1968)).  "Reasonable suspicion" exists where officers, based on the totality of the
11 circumstances, have a "particularized and objective basis for suspecting legal wrongdoing." Id.
12 (quotations and citations omitted).

13 "Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the
14 district court," and "[a]n evidentiary hearing on a motion to suppress ordinarily is required if the
15 moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court
16 to conclude that contested issues of fact going to the validity of the search are in issue." United
17 States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (citations omitted).

### III.

### ANALYSIS

20 The moving papers put forth contested issues of fact pertaining to the validity of the
21 search and seizure of the vehicle, and therefore the Court held an evidentiary hearing.  During
22 the February 7, 2019 hearing, the Court heard testimony from Ranger Dietzen, Defendant Sandi
23 McCoy, and the driver of the vehicle, Keith Beebe.

24 The Court finds Ranger Dietzen's testimony to be credible and supported by video
25 evidence of the incident that was presented to the Court during the evidentiary hearing.  Ranger
26 Dietzen has been employed by the National Park Service for almost twelve years, beginning as
27 an interpretive ranger, and transitioning into law enforcement work for five seasons at Lake
28 Mead in Arizona, before working at Sequoia National Park as a law enforcement officer between

1 October of 2016 and July of 2018.  Ranger Dietzen is currently a law enforcement officer at
2 Lake Mead again.
3    Ranger Dietzen's testimony given at the evidentiary hearing was substantially consistent
4 with the facts as described in her probable cause statement and incident report, as summarized
5 above in this order.  Ranger Dietzen confirmed that she turned her patrol vehicle around to
6 follow the blue Ford Focus after previously witnessing the driver, Mr. Beebe, placing what she
7 thought could be a beer into the vehicle.  On cross-examination by Defendant's counsel, Ranger
8 Dietzen clarified that she was not positive it was a beer can, but confirmed that is a reason she
9 followed the vehicle, but not why she stopped the vehicle.  After speeding up to reach the
10 vehicle, Ranger Dietzen testified that Mr. Beebe pulled the vehicle into a dirt pull-out with no
11 turn signal, and so she pulled in behind the vehicle in the dirt pull-out and then turned on her
12 overhead lights to signify she was stopping the vehicle.
13    After the incident, Ranger Dietzen testified that she finished her report, and downloaded
14 a video of the interaction into a database which provides courts with video evidence.  The video
15 was received into evidence as Exhibit 1.  The video, approximately thirty seconds long, was
16 played in the Court for the testifying witnesses.  While viewing the video, Ranger Dietzen
17 confirmed the facts of her previous testimony in relation to the events portrayed on the video.
18 Ranger Dietzen testified that the ranger in-vehicle camera system correlates with the overhead
19 vehicle siren lights, and an emblem appears onscreen at the moment the overhead lights are
20 turned on.  Of the most significance to the contested issues before the Court, the video was
21 paused at the moment the vehicle pulls into the dirt pull-out, and the emblem was not displayed.
22 Ranger Dietzen confirmed that if the lights were activated, the emblem would have been
23 displayed on the video in that frame, and therefore the moment the emblem appears is the point
24 she turned on her overhead lights.
25    The Court reviewed the incident video independently and found no indication that would
26 dispute Ranger Dietzen's testimony that she did not turn on her overhead lights until after she
27 witnessed the vehicle pull into the dirt pull-out without using a turn signal.  The emblem
28 signifying that the overhead lights are on does not appear until after the vehicle turns into the dirt

7

1 pull-out. However, the Court notes that there was a slight inconsistency between Ranger
2 Dietzen's initial testimony, her incident report, and the video evidence concerning the exact
3 moment the lights were turned on. In her incident report, and her initial testimony, Ranger
4 Dietzen states she pulled into the dirt pull-out behind the vehicle, then turned on her overhead
5 lights. The Court notes that in the video, the emblem signifying that the lights are turned on, in
6 fact, appears shortly before Ranger Dietzen pulls in the dirt pull-out behind the Ford Focus.
7 However, the Court finds the inconsistency to be more of a slight mistake given the speed of the
8 events, and not a willful untruthfulness. Further, upon another viewing of the video during the
9 evidentiary hearing, Ranger Dietzen offered her own clarification that corrected the
10 inconsistency, without any apparent suggestion from either counsel. While viewing the video,
11 she specifically offers that the lights may have been turned on "shortly before" she pulled into
12 the dirt pull-out, but confirms she did not turn them on until after the blue Ford Focus had turned
13 in without using a turn signal. The Court notes that at that point in the video, the vehicles are
14 going around a corner, and there is a very short time between the moment the lights are turned on
15 and when she pulled in behind the vehicle, approximately one or two seconds. This was a
16 reasonable and minimal discrepancy that did not impact the ultimate critical factor of whether the
17 lights were in fact on when the driver of the blue Ford Focus decided to turn into the pull-out.
18 The video evidence demonstrates the lights were not on at that point, in line with Ranger
19 Dietzen's testimony.

20   The Defendant, Sandi McCoy testified at the hearing. The Court does not find Ms.
21 McCoy's testimony to be credible. Ms. McCoy testified that Mr. Beebe told her they were being
22 pulled over, that she saw the lights flashing, and that Mr. Beebe then turned his turn signal on
23 before pulling into the dirt pull-out. On cross-examination, Ms. McCoy testified that she
24 specifically watched Mr. Beebe turn on the turn signal, and remembers him signaling at that
25 point. The video was played for Ms. McCoy, and while she identified the point at which she
26 believes she saw Mr. Beebe turn the signal on, she admitted she could not see the blinker in the
27 video. The Court notes that the brake lights are in fact visibly flashing on and off as the car
28 stopped in the turn-out, however the turn signal lights are not visible. While impossible to

1  determine with certainty without expert analysis, the Court finds that given the brake lights are
2  visibly flashing at that point, it is reasonable to assume the turn signal lights should be visible as
3  well in the video.  This weighs against the credibility of Ms. McCoy given the unlikelihood that
4  she distinctly remembers as a passenger that the driver used the turn signals, especially during a
5  very short period of time from the point she says they signaled coming around the corner to the
6  time they in fact pulled over, and further given that being followed and potentially pulled over is
7  a moment in time that was likely hectic and stressful for both Ms. McCoy and Mr. Beebe.

8        The Court does not find Mr. Beebe's testimony to be entirely credible.  When asked if he
9  uses turn signals, Mr. Beebe stated "always," however admitted he could not say for certain in
10 this case because it happened so quickly.  When asked about what Ranger Dietzen did after
11 pulling the vehicle over, Mr. Beebe testified that Ranger Dietzen approached the passenger
12 window and began asking questions.  When asked if Ranger Dietzen explained why she pulled
13 him over, Mr. Beebe stated she did not tell him at the time he was pulled over, and that it was not
14 until he asked Ranger Dietzen near the end of the encounter why she had pulled him over that
15 she then told him it was because of the failure to use a turn signal.  However, in Mr. Beebe's
16 declaration submitted with the briefing materials, Mr. Beebe declares that after being pulled
17 over, Ranger Dietzen "approached [his] window and stated that she pulled [him] over for not
18 using [his] turn signal when [he] pulled into the turnout."  (Beebe Decl. at 3.)  On cross-
19 examination by Defendant's counsel, Ranger Dietzen confirmed that she did state to Mr. Beebe
20 the reason she pulled him over when she pulled him over.  Ranger Dietzen also answered that
21 people are typically not confused when she pulls them over, because it is her normal practice to
22 announce the reason for the stop at the time a person is pulled over.

23       Based upon the moving and opposition papers and the evidence presented at the February
24 7, 2019 hearing, the Court finds that the Ranger Dietzen did not turn on her vehicle's overhead
25 lights until after the blue Ford Focus had pulled into the dirt pull-out without using a turn signal,
26 and therefore the vehicle was properly stopped for not signaling prior to turning into the dirt pull-
27 out.  The totality of the circumstances involved in the stop of the vehicle here do not violate the
28 Fourth Amendment as the officer had reasonable suspicion of legal wrongdoing to support the

seizure, and therefore Defendant's motion to suppress is denied. See <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968)).

## IV.
## CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

Dated: __February 14, 2019__

UNITED STATES MAGISTRATE JUDGE